### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Special Agent Brian Sweger, Drug Enforcement Administration (DEA), being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the DEA and have been so employed since September 2010. Since May 2017, I have been assigned to the Tactical Diversion Squad, in Worcester, Massachusetts. Prior to my current assignment, I was assigned to the Organized Crime Drug Enforcement Task Force, New York Strike Force, which included representatives from the DEA, Homeland Security Investigations, the New York City Police Department, and New York State Police, among other agencies.

2. My primary duties at the DEA include the investigation of organized drug trafficking organizations. I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

3. Prior to becoming a DEA Special Agent, I was employed by the Massachusetts Bay Transportation Authority, Transit Police Department as a Police Officer from April 2006 to September 2010. I hold a Bachelor of Science Degree in Criminal Justice from Northeastern University.

4. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I received training regarding narcotics investigations while attending the Basic Agent Academy in Quantico, Virginia. During my career, I have attended additional specialized training courses in furtherance of my past and current assignments.

5. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, and to protect their operations, members, narcotics, and narcotics proceeds.

6. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

7. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use personal and rented cars and trucks, common

carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.

8. Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

9. I am currently working on a criminal investigation involving possession with intent to distribute, attempt, and conspiracy to possess with intent to distribute anabolic steroids in the District of Massachusetts and elsewhere, in violation of the Controlled Substances Act, Title 21, United States Code, Sections 841(a)(1) and 846 (hereinafter the "TARGET OFFENSES").

10. I submit this affidavit in support of an applications pursuant to Rule 41 of the Federal Rules of Criminal Procedure for two warrants authorizing the search of: (a) the premises located at 3 Office Hill Road, Dudley, Massachusetts (hereinafter the "TARGET PREMISES"), as more fully described in Attachment A-1; and (2) the person of Konrad SUDYKA (born 2002) as more fully described in Attachment A-2.

11.     As described herein, there is probable cause to believe that the TARGET PREMISES and SUDYKA's person will contain: evidence of a crime; contraband, fruits of crime, or other items illegally possessed; and property designed for use, intended for use, or used in committing a crime, namely the TARGET OFFENSES.

12.     The items to be searched for and seized are described in more detail in <u>Attachment B</u>, and include evidence maintained in electronic format on mobile telephone, including smartphones, found in the TARGET PREMISES or on SUDYKA's person, that reasonably appear to law enforcement to belong to or be used by SUDYKA. The methods by which any mobile telephones will be searched are more fully set forth in the "Seizure of Cell Phones" section of this affidavit. The items to be seized constitute evidence, contraband, or fruits of the TARGET OFFENSES.

13.     The information set forth in this affidavit is based on an investigation conducted by law enforcement agents, including myself. I have reviewed certain reports prepared by other law enforcement officers regarding their observations and I have had conversations with other law enforcement agents regarding other facts developed during this investigation. This affidavit is intended to establish sufficient probable cause for the issuance of the requested search warrants and does not set forth all of my knowledge about this matter

## **<u>RELEVANT STATUTES</u>**

14.     Title 21, United States Code, Section 841(a)(1) provides that "it shall be unlawful for any person knowingly or intentionally -- to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."

15.     Anabolic steroids are classified as Schedule III controlled substances as defined in Title 21, United States Code, Section 812(c).

16. Anabolic steroids are defined in Title 21, United States Code, Section 802(41)(A) as "any drug or hormonal substance, chemically and pharmacologically related to testosterone." Section 802(41)(A) also includes a non-exhaustive list of over fifty recognized anabolic steroids.

17. The term "manufacture" is defined in Title 21, United States Code, Section 802(15) as "the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of such substance or labeling or relabeling of its container."

## PROBABLE CAUSE

18. In September 2022, I received information indicating Konrad SUDYKA was the intended recipient of one kilogram of Femistra Anastrozole shipped from India. Femistra Anastrozole is an estrogen blocker. It is commonly used in conjunction with the use of anabolic steroids to counteract unwanted gynecomastia (development of excess breast tissue in males from a testosterone/estrogen imbalance). The intended medical use is to treat breast cancer in women after menopause. Anastrozole is manufactured by Cadila Healthcare, Ltd., in Ahmedabad, India, and it is not currently registered with the U.S. Food and Drug Administration (FDA) or scheduled by the DEA.[1]

19. On February 16, 2023, I was present at the U.S. Customs and Border Protection (CBP) office in Warwick, Rhode Island during a package inspection. The DHL Express

---

[1] Shipping records revealed that SUDYKA received two prior shipments of Anastrozole, including one shipment of 9.36 kilograms in February of 2022.

Worldwide package (bearing waybill number 1164100195) was addressed to Konrad SUDYKA at the TARGET PREMISES[2]. CBP detained the package on February 7, 2023, and held the package pending inspection. Upon inspection, the package contained two (2) boxes labeled "Anastrozole Tablets IP, Femistra," each of which contained several rubber banded bundles of foil-wrapped strips; each strip contained 10 pills. There were twenty-two (22) bundles between the two boxes. CBP estimated there were approximately 2,160 pills contained in approximately 216 strips.

20. FDA Investigator Joseph Procopio reported the following: the manufacturer of the pills is Cadila Healthcare Ltd., Survey No. 417,419 and 420, Sarkhej Bavla N.H. No. 8A, Moraiya, Ahmedabad District-382 210, India, FEI# 3012324262. The dosage for the drug Anastrozole is one tablet/day. As such, a quantity of 2160 tablets comprises, approximately, a six-year supply. The packaging label declared that Anastrozole is not to be sold without the prescription of a Registered Medical Practitioner. A prescription, dated March 1, 2023, from Dr. Prabhakar Anant Deshpande was included within the package. The prescribing doctor holds a "BAMS" degree, which is not recognized in the United States. CBP subsequently seized the package based on the FDA violations.

21. DEA investigators served administrative subpoenas upon LFA MACHINES DFW, LLC., requesting information pertaining to the sale of any machine and/or excipient (meaning coloring agents, preservatives, and fillers) to Konrad SUDYKA and/or the TARGET PREMISES. LFA manufactures and sells "Firmapress," a tableting powder and binding agent

---

[2] The package was shipped by TAMBE DARSHANA DATTATRAY, 2.23 NETAJI NAGAR, PUNE CITY, WANOWARIE, 411040 PUNE, INDIA on February 2, 2023. The package weighed 1.00 kg.

frequently used in clandestine pill press operations. The subpoena results showed that between January 2022 and January 2023, SUDYKA purchased approximately 181 kilograms of Firmapress in various colors, most commonly blue and yellow, as well as a punch die for a TDP-5, a tableting machine.

22.     CBP records indicate that on or about May 26, 2022, CBP Providence detained a package described as a "stainless steel tablet sieving" machine. A tablet sieve eliminates dust on the tablet surfaces and edges burrs and irregularities in order to make the tablet surfaces clean and the edges neat. The package was sent by SHENZHEN JIANWEI TECHNOLOGY CO LTD, 501 BUILDING 17 XIANGNAN 4TH DISTRIC, HONG KONG, and addressed to SUDYKA at the TARGET PREMISES. CBP released the tablet sieve for delivery to the Target Premises in June 2022.

23.     On January 20, 2023, I was present during a CBP inspection of two packages addressed to SUDYKA at the TARGET PREMISES. The packages, which were shipped on January 10, 2023, bore labels identifying the shipper as Mandy LIU, Tianjin Horizon Import and Export CC, No 103 Building 2, Zhidian Industrian Park, Fuxing East Road, Baoding, China 071000. One package weighed 1 kilogram, the other weighed 9 kilograms. Upon inspection, the packages contained a "Shenchen Precision Pump," tubing, and manuals. A search of open sources revealed that the pump is an V6-6L/4*EasyPump, described as a "customized multichannel peristaltic pump" for "multichannel filling and dispensing."

24.     On January 23, 2023, I conducted physical surveillance at the TARGET PREMISES. At approximately 9:47am, I observed a FedEx employee deliver three packages to the left-hand door of the TARGET PREMISES. Two of the packages appeared similar in size and color to those inspected in my presence. I observed a male take possession of the packages

and bring them inside the left door. Tracking information shows the packages were delivered on Monday, January 23, at approximately 9:46am to "A.ZAKHAROV." A public records search of the TARGET PREMISES did not list anyone by that name at the address.

25. Periodic surveillance of the residence and neighborhood showed that trash collection typically occurs on Tuesday mornings. That surveillance also revealed that the residents of the TARGET PREMISES place their household trash in green barrels in front of a wooden fence adjacent to the driveway on the left side of the house.

26. During the evening of Monday, February 13, 2023, agents observed a male believed to be SUDYKA carry a black plastic trash bag from the right-hand door on the front porch of the TARGET PREMISES and place it into a trash barrel outside the residence.

27. On the morning of Tuesday, February 14, 2023, I observed that the trash barrel described in the preceding paragraph was moved closer to the road for collection. At approximately 7:40 a.m., I retrieved the contents of the barrel and examined them. The contents included:

    a. Three (3) empty 5 kg bags of yellow Firmapress;

    b. Dozens of pairs of used latex gloves;

    c. Surgical masks;

    d. Mail and packages addressed to Konrad SUDYKA at the TARGET PREMISES;

e. Empty gallon-size Ziploc bags with handwritten labels "Dbol,"[3] "Cialis 20," "Cialis," ANADROL 50,"[4] "Superdrol 10,"[5] and "Clomid 50."[6] All bags contained powder residue. The bag labeled "Clomid 50" contained two (2) round yellow unmarked pills;

f. Two (2) additional round yellow unmarked pills matching those two found above;

g. Empty plastic bags labeled "TADA," "TE," "OA." All bags contained powder residue;

h. Empty foil bags labeled "Dbol," "Anadrol 50 (535.0g)," "Tren A[7] (100g)," "A35 (100g)." All bags contained powder residue;

i. Empty gallon jugs of grapeseed oil and distilled water;[8]

j. Tubing labeled "Shenchen Silicone Tubing 15#," which matched the tubing I observed in the shipment inspected by CPB officers on January 20, 2023;

k. Empty glass vials;

l. Empty syringes and needles;

---

[3] From my training and experience, I am aware that "Dbol" is commonly used shorthand for dianabol, an anabolic steroid.

[4] From my training and experience, I am aware that Anadrol is another commonly used anabolic steroid.

[5] From my training and experience, I am aware that Superdrol is another commonly used anabolic steroid.

[6] From my training and experience, I am aware that Clomid is a testosterone booster

[7] From my training and experience, I am aware that "Tren" is commonly used shorthand for trenbolone, an anabolic steroid.

[8] From my training and experience, I am aware that Grapeseed oil and distilled water are commonly used to mix powdered steroids and place into vials for intramuscular injection.

    m.    Unused sticker labels marked "Biopharm Tren A 100. Trenbolone Acetate 100mg/ml. 10 ml sterile multiple dose vial for intramuscular use only. Biogen Pharma," "Biopharm TEST C 200. Testosterone Cypionate 200mg/ml. 10 ml sterile multiple dose vial for intramuscular use only. Biogen Pharma," and "Biopharm TEST E 250. Testosterone Enanthate 250mg/ml. 10 ml sterile multiple dose vial for intramuscular use only. Biogen Pharma;"

    n.    Empty unsealed bag labeled "Biopharm CIALIS 20, 50 tablets. Biogen Pharma;"

    o.    Unused USPS shipping labels to different recipients, all from "SNA Compounded, 195 Hartford Pike, Killingly CT 06241." Recipients included Phillip Brown, 6004 96th Street, Lubbock TX 76424; Lee Shepherd, 103 Woolworth Ave, Lavale MD 21502; Matthew Parker, 229 Frying Pan Ct, Boiling Springs SC 29316; Lincoln Blake, 435 Orange Ave Apt 7, Long Beach CA 90802. Visible USPS tracking numbers were 9405511206223866112787, 9405511206223866112916, 9405511206223868307235;

    p.    USPS shipping label addressed to Michael Ayello, 300 West 16th Street, Deer Park NY 11729. The sender was "OptiHealth Fulfillment A, 19 Texas Heights Road, Plainfield CT 06374;"

    q.    Manual for a "SmartWeigh shipping and postal scale;"

    r.    Polycap AS aqueous solution filter capsule; and

    s.    One (1) empty package for 145 10ml sterile vials from "Gerresheimer Queretaro SA," located in Mexico.

The above items were contained in two black plastic trash bags which were the only two black bags recovered from the trash barrel. The remaining bags in the barrel were either clear or white plastic and contained only general household trash.

28. On March 2, 2023, personnel at the DEA Northeast laboratory confirmed the presence of stanozolol, a Schedule III controlled substance, in one of the pills seized from the February 14, 2023, trash pull from the TARGET PREMISES. Stanozolol is an anabolic steroid.

29. Public record searches identify only Konrad SUDYKA and two individuals believed to be his parents, Wieslaw and Ewa SUDYKA, as residents of the TARGET PREMISES. SUDYKA's Massachusetts driver's license lists his address as the TARGET PREMISES and, as noted above, trash recovered from outside the TARGET PREMISES contained mail and empty packages shipped to SUDYKA at the same address.

30. SUDYKA provided a contact number of 774-476-8570. The service provider for this cell phone number is T-Mobile. T-Mobile subscriber records for the -8570 number identify Konrad SUDYKA at the TARGET PREMISES as the subscriber. An analysis of the toll records provided by T-Mobile showed CashApp and Binance Cryptocurrency as high frequency contacts. CashApp is an application used to electronically send money from one person to another, and Binance is a cryptocurrency exchange where users can purchase and transfer cryptocurrency.

31. Based on my training and experience, I believe the contents of the trash recovered from the TARGET PREMISES, coupled with SUDYKA's purchases of large amounts of pill binding agent, a pill polishing machine, and a metal die for a pill pressing machine, indicate that SUDYKA is involved in the manufacture and shipment of illicit steroids from the TARGET PREMISES.

32. Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

   a. Controlled substances and materials used to "cut" or dilute those substances.

   b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

   c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

   d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g. Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the TARGET PREMISES. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

j.  Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

## SEIZURE OF COMPUTERS AND CELL PHONES

33. Based on my knowledge, training, and experience, I know that electronic data can be recovered months or years after it has been created, downloaded, saved, deleted, or viewed over the internet because:

   a. Electronic files can be stored for years at little or no cost.

   b. When a person "deletes" a file on a smartphone, tablet, or computer, the data contained in the file does not actually disappear; rather, that data remains until it is overwritten by new data, which might not occur for long periods of time. In addition, a smartphone, tablet, or computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Virtual memory paging systems can leave traces of information that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

34. Information stored on a smartphone, tablet, or computer provides crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation. In my training and experience, information stored on a smartphone, tablet, or computer (*e.g.*, communications, images and movies, transactional information, internet history, location information) can indicate who has used or controlled the phone, or the physical location of other user.

35. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in a smartphone, tablet, or computer, to ensure the accuracy and completeness of

such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that the phones be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because:

    a.    There can be a large volume of data. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

    b.    Analyzing evidence from a smartphone, tablet, or computer is a highly technical process requiring expertise and a properly controlled environment. The array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.

36.    Consequently, law enforcement agents request authorization to either copy the data at the premises to be searched or seize the smartphone, tablet, or computer for later processing elsewhere.

37.    The premises may contain smartphones, tablets, or computers, whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Smartphones, tablets, or computers can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.

38.    The law enforcement agents will endeavor to search and seize only the smartphones, tablets, or computers which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in the

respective Attachments B because they are associated with (that is used by or belong to) SUDYKA. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular smartphone, tablet, or computer, the law enforcement agents will seize and search that mobile phone pursuant to the probable cause established herein.

39. This warrant authorizes a review of electronic storage media seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any Government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the Government, attorney support staff, and technical experts. Pursuant to this warrant, the law enforcement agents may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the Government and their support staff for their independent review.

### UNLOCKING A DEVICE USING BIOMETRIC FEATURES

40. I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

41. On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that

has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

42.     The passcode that would unlock the Apple device(s) found during the search of the TARGET PREMIES, if any, is not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of the Apple device(s) found during the search of the TARGET PREMISES to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The Government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

43.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of SUDYKA to the sensor of the devices or place the devices in front of SUDYKA's face for the purpose of attempting to identify the user of the device in order to search the contents as authorized by this warrant.

## **CONCLUSION**

44. Based on the foregoing, there is probable cause to believe that SUDYKA has committed the Subject Offense, and that contraband, property, evidence, fruits, and instrumentalities of that offense are located at the TARGET PREMISES or on the person of SUDYKA. I respectfully request that this Court issue warrants authorizing the search of the locations described in Attachments A-1 and A-2, and the seizure and search of the items described in Attachment B.

I declare that the foregoing is true and correct.

*Brian Sweger*
Brian Sweger
Special Agent
Drug Enforcement Administration

Time and Date:   3:35 p.m.   **Mar 21, 2023**

Notice is hereby provided that, pursuant to Federal Rule of Criminal Procedure 4.1, the affiant was sworn by telephone on the date and time indicated above and on the search warrants issued by the Court.

_____
HONORABLE DAVID H. HENNESSY
United States Magistrate Judge